`

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LAVETA DIANE SOWELL                          CIVIL ACTION

VERSUS                                       NUMBER: 10-01835

MICHAEL J. ASTRUE,                           SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

<u>**REPORT AND RECOMMENDATION**</u>

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 18, 22, 24).

Laveta Diane Sowell, plaintiff herein, filed the subject application for SSI benefits on September 12, 2007, with a protective filing date of September 4, 2007, alleging disability as

of September 1, 1998. (Tr. pp. 102-104, 130, 46).[1]/ Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on January 18, 2008. (Tr. pp. 41, 42).[2]/ Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on January 6, 2009 at which plaintiff, who was attended by a non-attorney representative, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 70, 8-40).  On May 13, 2009, the ALJ issued a written decision in which she concluded that plaintiff was not disabled with in the meaning of the Social Security Act. (Tr. pp. 43-61).  The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 3-7).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.   Ms. Sowell is disabled because she meets Listing 12.05C.

II.  [t]he ALJ's IQ validity finding is founded on legal

---

[1]/ Plaintiff subsequently amended the alleged onset date to September 12, 2007. (Tr. pp. 136, 13).

[2]/ In connection with that initial level denial, the State Disability Determination Services identified plaintiff's disabling conditions as toe amputations and a learning disorder. (Tr. p. 41).

error.

III. [t]he ALJ committed legal error by failing to evaluate medical equivalence.

IV. [t]he ALJ failed to develop the record in regard to adaptive deficits.

V. [t]he ALJ's dispositive hypothetical question did not contain all of Ms. Sowell's physical and mental limitations.

VI. [t]he ALJ's medical compliance analysis violated agency policy.

(Rec. doc. 18-1, p. 2).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1. [t]he claimant has not engaged in substantial gainful activity since September 4, 2007, the application date (20 CFR 416.971 et seq.).

2. [t]he claimant has the following severe impairments: ongoing polysubstance abuse, alcohol and marijuana; status post history of amputation of four toes of the left foot as an infant; hypertension; chronic dysthymia and personality disorder versus substance induced mood disorder; possible learning disability, with a reported history of special education; and possible borderline intellectual functioning versus the effects of polysubstance abuse (20 CFR 416.920(c)).

3. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except with occasional climbing, balancing, stooping, kneeling, crouching, or crawling; no

3

climbing ladders, ropes, or scaffolds; and the non-exertional mental limitations of performing only one to two step tasks.

5.   [t]he claimant has no past relevant work (20 CFR 416.965).

6.   [t]he claimant was born on June 10, 1963 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   [t]he claimant has a limited education and is able communicate in English (20 CFR 416.964).

8.   [t]ransferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  [t]he claimant has not been under a disability, as defined in the Social Security Act, since September 4, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 48, 49, 52, 60, 61).

Judicial review of the Commissioner's decision to deny SSI benefits is limited to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are

supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the

5

claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  <u>Harrell</u>, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.
>
> 5.  if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  <u>Fraga</u>,

810 F.2d at 1304 (citing <u>Lawler v. Heckler</u>, 761 F.2d 195, 198 (5th Cir. 1985)).   Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988); <u>Fraga</u>, 810 F.2d at 1302.

After the documentary exhibits were formally admitted into evidence at the outset of the administrative hearing that was held on January 6, 2009, plaintiff's representative formally moved to amend the alleged onset date to September 12, 2007.  He then proceeded to give an opening statement, arguing that plaintiff had never engaged in substantial gainful activity, that she had attended special education classes until the eleventh grade, and that she suffered from ambulatory problems as a result of losing three of her toes in a house fire when she was just eight months old.  Citing the results of a psychological evaluation conducted by Dr. Culver, the representative further argued that plaintiff had achieved a verbal IQ test score of 65 which, when combined with her ambulatory difficulties, satisfied the criteria of Section 12.05(C) of the Listing of Impairments and thus directed a finding that she was disabled.   The representative and the ALJ disagreed as to whether plaintiff was capable of performing light or even sedentary-level work. (Tr. pp. 10-15).

Plaintiff then took the stand and was questioned by the ALJ.

7

She was forty-five years old at the time and lived with her mother
who was then in the hospital after suffering a stroke.  When asked
to elaborate on her foot problems plaintiff testified that she
experienced a constant, throbbing, toothache-like pain even when
sitting and that a local doctor had told her that she had bad
nerves in both of her legs and feet.  Plaintiff also made vague
reference to some surgical procedure she had undergone in the past
because her feet had stopped growing.  She testified that her
doctor would not prescribe anything strong for the pain to her legs
and feet so she typically took Goody's Powders for relief.
Plaintiff disavowed using illegal drugs for the previous two years,
had attended a rehabilitation program at some point in the past for
two to three months, and had served three months in jail in 2000
for fighting.  In addition to pain, plaintiff experienced tingling
in her feet as well as a good deal of back pain, having been told
that a bone in her back was slanted. (Tr. pp. 15-19).

In terms of her home life, plaintiff testified that she helped
her mother with the typical household chores, cooking, and shopping
when her feet did not hurt.  Plaintiff's sister and the sister's
three children also lived in the same residence and plaintiff
occasionally supervised the children and watched TV with them.  She
also went out to eat with her mother or sister from time to time.
Plaintiff had once gone grocery shopping alone and ended up

purchasing the wrong item. In light of her mother's hospitalization, plaintiff was temporarily residing at another sister's home. (Tr. pp. 19-23).

Continuing, plaintiff testified that she had last worked in the 1990's as a dishwasher. She did not drive, had no checking or savings accounts, and could barely read or write, only being able to recognize words of three to four letters. Plaintiff could not stand for very long before experiencing tingling in her legs but she did not use an assistive device. She had only begun seeing a doctor following a suicide attempt in 2003. (Tr. pp. 23-25). Upon being tendered to her representative for additional questioning, plaintiff testified that her dishwashing job had lasted for only two to three months until its end due to leg pain. Family issues caused plaintiff to be nervous and to become angered easily, for which she would drink beer. She did not attend church or other social activities but primarily spent her time watching TV, playing games with her sister's children, occasionally cooking, occasionally doing small chores, and visiting two of her sisters. Plaintiff explained that she had served three months in jail for a crime that she did not commit. She had taken the driver's license test at some point but had failed it even though the test had been administered to her orally. (Tr. pp. 25-31).

John Yent, a VE, was next to take the stand. After

9

acknowledging that plaintiff essentially had no past relevant work experience, the ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age and education who was limited to light-level work with occasional climbing of ramps/stairs, no climbing of ladders/ropes/scaffolds, occasional balancing, stooping, kneeling, crouching, and crawling, and work requiring only one to two-step tasks.  In answer thereto, the VE testified that the individual described in the hypothetical question could perform the light, unskilled jobs of fast food worker, cafeteria attendant, or dishwasher, with significant numbers of such jobs existing in the national and local economies. The ALJ then posed a second hypothetical question which assumed an individual of plaintiff's age and education who was limited to sedentary-level jobs that required only one to two-step tasks.  In answer to that second hypo, the VE testified that the described individual could perform the sedentary, unskilled jobs of survey worker, information clerk, and general office clerk.  Yet a third hypothetical question was posed to the VE which assumed a person who was limited to sedentary work that involved only one to two-step tasks and with no contact with the public.  In answer to that third hypothetical question, the VE testified that all of the jobs that he had identified would probably be excluded. (Tr. pp. 31-36).

    Upon being questioned further by plaintiff's representative,

the VE was asked what effect on employability there would be if the claimant could read only three-letter words and could not comprehend a menu or labels. In answer to that question, the VE testified that such an individual would be at a non-functional level of illiteracy and would likely be unable to work at all. After describing the language development requirements of the jobs that he had identified the VE testified that if plaintiff was illiterate only the cafeteria attendant and dishwasher jobs could be performed. (Tr. pp. 36-40).

The documentary evidence that was admitted in the administrative proceedings below begins with records from the Bogalusa Medical Center ("BMC") where plaintiff was admitted for a five-day stay in September of 2004 after attempting suicide by ingesting a quantity of Clonidine, Lisinopril, and HCTZ. During her inpatient stay, plaintiff admitted to a history of alcohol and marijuana use and she was assessed as having a GAF of 35. Upon being discharged, plaintiff was transported via ambulance to an acute psychiatric facility for further treatment. (Tr. pp. 164-191). Plaintiff subsequently underwent an aftercare psychiatric evaluation at the Bogalusa Mental Health Center on October 12, 2004. Being forty-one years of age at the time, plaintiff was said to have had a long history of alcohol dependence which involved the purchase of beer whenever she had money and drinking until she

passed out.  Past history also included several suicide attempts, all when plaintiff was intoxicated. She further related nightmares, being startled easily, and recurrent thoughts of a troubled childhood.  However, she did not have symptoms of depression when sober, her only chronic symptom being loss of sleep which was thought to be possibly due to post-traumatic stress disorder ("PTSD"). There were no symptoms of mania or psychoses. On mental status examination, plaintiff was observed to be clean, calm, and cooperative with good eye contact and logical thought processes. There were no current suicidal thoughts, homicidal ideations, or delusions.  Plaintiff's mood was described as nervous and her affect was stable but mildly anxious.  The overall assessment was as follows: Axis I - alcohol dependence and PTSD; Axis II - no diagnosis but recognition of plaintiff being in special education; Axis III - recent overdose; Axis IV - unemployed/unskilled; and, Axis V - a GAF of 65/100.  Plaintiff was referred to outpatient alcohol rehabilitation with the possibility of returning for further evaluation once she was sober. (Tr. p. 225).

The next medical records were not generated until April 25, 2006 when plaintiff was evaluated at BMC for chest and abdominal pain and abnormal EKG results.  Plaintiff was counseled on medication importance and diet. (Tr. pp. 143-144).  She was still complaining of pain when she was next seen at BMC on January 23,

12

2007. (Tr. pp. 145-146).  On July 10, 2007, plaintiff underwent a transvaginal ultrasound which confirmed the presence of several benign cysts in the right ovary that had previously been revealed via a transabdominal approach on July 5, 2007. (Tr. p. 299). Plaintiff was next seen at BMC for follow-up care on July 12, 2007 at which time she complained of tingling to her feet.  The use of alcohol and street drugs was disavowed.  The diagnosis included hypertension and a back strain. (Tr. pp. 147-148, 296-297).

Plaintiff returned to BMC to obtain the results of the ultrasound on August 13, 2007.  Complaints at the time included irregular menses, pelvic pain, and on-and-off back pain of two days' duration. (Tr. pp. 292-295). She was next seen at the BMC Gynecology Clinic on September 6, 2007 and a repeat pelvic ultrasound was ordered.  No other complaints were voiced at this time. (Tr. pp. 290-291, 264-265).

The administrative record also contains an undated "Function Report-Adult" form that was presumably completed on plaintiff's behalf around the time that she applied for Social Security benefits. Plaintiff lived in a house with other family members and suffered from back pain and nightmares which interrupted her sleep. She could tend to her own personal needs and prepare meals on her own twice per week but principally relied on her mother to do the bulk of the cooking because she could not stand up for significant

13

periods of time.  Plaintiff was able to pick up and fold clothes as directed by her mother but did no yardwork, mopping, sweeping, or anything of a heavy exertional level. She went outside daily, either walking or being driven in a car, and could go out alone but did not drive as she had no license and was reportedly unable to read street signs.  Plaintiff went grocery shopping twice per month but had to be accompanied by her mother because of her reading deficit.  She could count change but was unable to pay bills, handle a savings account, or use a checkbook/money orders.  Outside interests were watching TV.  Plaintiff visited with family members every week, attended ball games with her sister, and occasionally went to church. She had to be reminded to attend doctors' appointments, had bad nerves, and was known to complain a great deal.  Almost all abilities were effected by plaintiff's impairments due to back pain, tingling in the feet, and poor understanding.  Plaintiff could pay attention for only fifteen minutes, was unable to finish what she had started, and had to ask follow-up questions before following spoken instructions. Plaintiff had never been fired or laid off from a job because of problems getting along with other people, did not handle changes in routine well, and had an unusual fear of heights and the dark, leading her to sleep with the lights on. (Tr. pp. 119-126).

Transvaginal and pelvic sonograms were subsequently performed

on plaintiff on September 25, 2007.  That testing revealed that the
right ovarian cyst that was seen through the previous study was no
longer present and that only two small benign cysts remained.
However, plaintiff had since developed a complex cystic density in
her left ovary. (Tr. pp. 254-257).  Routine labwork was done on
October 18, 2007. (Tr. p. 289).  Plaintiff returned to BMC to
obtain the test results on November 2, 2007.  The screening
paperwork from that day documents plaintiff's complaints of on-and-
off back and stomach pain at a level of "10" which had been present
"for years".  Further testing was ordered, including a colonoscopy,
as was a referral to Dr. Geoffray. (Tr. pp. 286-288).

On November 15, 2007, plaintiff was consultatively evaluated
by Dr. Harry Jasmin.  Presenting problems were identified as a
history of chronic depression and multiple suicide attempts, the
first one as a teenager and the last one in 2003 which was followed
by a hospital admission.  Plaintiff reported suicidal thoughts on
an average of two to three times per month but with no plan to act
on her thoughts.  Medications at the time included Wellbutrin,
Atenolol, and KCL tabs and plaintiff admitted to occasional
marijuana use.  Upon physical examination, plaintiff presented as
very cooperative, appropriately dressed, and able to express ideas
logically with no pressured speech but with a depressed mood.  Her
gait was slightly antalgic.  Range of motion of all joints was

15

normal as was straight leg raising testing but plaintiff was noted to have four toes amputated from the left foot with extensive scarring from below the knee to the foot.  Speech and thought processes were normal but thought content was positive for suicidal ideation.  Plaintiff had a flat affect with judgment and insight said to be fair and with a normal IQ.  In the assessment portion of his report, Dr. Jasmin diagnosed plaintiff as having a GAF of 45 and in need of intensive therapy for mental illness.  She also had an unsteady gait secondary to her left foot injury but no abnormal findings with respect to the back.  From a physical standpoint, the doctor believed that plaintiff was capable of performing light to moderate duties with lifting of no more than fifteen pounds and standing for no longer than fifteen minutes.  The doctor also believed that plaintiff's depression and suicidal ideations needed to be addressed permanently. (Tr. pp. 149-152).

Plaintiff was next seen at the BMC GI Clinic on November 28, 2007 for complaints of left upper quadrant and back pain along with nausea, vomiting, weight loss, and episodic blood in the stool. The treatment note from that day indicates that plaintiff took six BC Powders daily and had a history of anemia and heavy alcohol use, the latter of which had decreased to one day weekly of heavy beer drinking.  A colonoscopy was scheduled. (Tr. pp. 282-283).

On December 10, 2007, plaintiff underwent a consultative

16

psychological evaluation by Dr. Lester Culver at the behest of the
State Disability Determination Services. Physical complaints voiced
by plaintiff included foot problems, back and leg pain, arthritis,
muscle spasms, sleeplessness, and tingling in the feet.  At the
outset of the evaluation, plaintiff was provided a HIPPA release
form which she read out loud and signed although she needed help
with the longer words.  In Dr. Culver's opinion, plaintiff's verbal
description of the evaluation procedures and the consent form
indicated adequate comprehension.  Visual acuity was intact.

In providing her psychiatric history, plaintiff stated that
she was easily agitated, had suicidal thoughts, felt hopeless and
worthless several times per week, had crying spells two or three
times per week, and had interrupted sleep.  These psychological
difficulties had reportedly begun when plaintiff was a child.
Despite having lost ten pounds in the previous month, plaintiff's
appetite was improving. Her only hospitalization had been for the
overdose in 2004 and AA and NA meetings had been attended in 2001
and 2002.  Plaintiff's last suicidal ideation had been a week
earlier but without a plan.  She also related being sexually
molested by her mother's boyfriend, being physically abused by
three of her own boyfriends, and having a propensity to fight,
especially when drinking.  She had last used marijuana six months
earlier, crack cocaine eighteen months earlier, and alcohol the

previous week when she drank until she was intoxicated. Incarcerations for fighting and public drunkenness went back to the 1980's with her longest stint in jail being three months in the early 2000's for "cutting somebody up."

In terms of medical history, plaintiff advised the doctor of her foot issues, high blood pressure, an appendectomy, breast and shoulder surgery, and two stab wounds. Physically, she was able to sit for over an hour during the course of the evaluation and could walk two blocks. Plaintiff also reported memory problems but sustained attention and persistence were sufficient to watch a movie for two hours and none of the doctor's questions had to be repeated to be understood. Socially, she had dropped out of special education classes but had never been expelled although she had been suspended for fighting. Previous jobs included work at a chicken farm, a fast food restaurant, and a nursing home. Daily activities included playing video games, watching TV, cooking, folding clothes, and sweeping. Plaintiff could go to the store and could count change but could not read well. She essentially had no friends.

As part of the evaluation process, plaintiff was administered the WAIS-III test, achieving a verbal IQ score of 65, a performance IQ score of 80, and a full scale IQ score of 69. Based on those results, plaintiff was felt to be performing in the dull normal

18

range on performance intelligence and in the mildly deficient range on verbal intelligence but the full scale IQ score was not interpretable.  There was no evidence that plaintiff was missing items on purpose and as the difficulty level of a given portion of the test increased, so did her errors.  Throughout the evaluation, plaintiff exhibited no compulsions, unusual motor behavior, or hyperactivity and she was calm with good eye contact and rapport. Motivation was good, plaintiff was able to follow simple instructions, and she was understandable with no evidence of a thought disorder of form.  Orientation, attention, and memory were normal and there was no evidence of delusions or paranoia but her fund of information was poor.  Plaintiff could repeat seven digits forward and three backward.  She could also repeat four nouns on the first trial and three out of four concrete nouns after five minutes. In Dr. Culver's opinion, plaintiff suffered from a mixed personality disorder with borderline and antisocial traits, was chronically dysthymic, and intellectually functioned in a range going from mildly deficient to dull normal.  Plaintiff was characterized as an alcoholic who still drank occasionally, had limited arithmetic skills, and likely needed help managing her own funds.  The doctor deferred commenting on any limitations resulting from plaintiff's physical problems.  Dr. Culver'S DSM IV diagnosis was as follows: Axis I - dysthymic disorder and alcohol dependence;

Axis II - personality disorder, not otherwise specified, with borderline and antisocial traits; Axis III - deferred; Axis IV - psychosocial and environmental problems of having no friends and being unemployed; and, Axis V - a GAF of 45. (Tr. pp. 155-162).

Plaintiff presented to the BMC Medicine Clinic on December 19, 2007 expressing uncertainty as to why she was there that day as she had an appointment with Dr. Pham scheduled in February of 2008. She was continued on her then-present medications. (Tr. pp. 280-281). An occult blood screening test was performed on January 15, 2008 which was positive for two of the three samples. (Tr. pp. 253, 279).

On January 18, 2008, in connection with the initial denial of plaintiff's application for SSI benefits, an Administration psychological consultant ("PC") reviewed plaintiff's file and set forth her findings in two separate standardized forms. In the first form, denominated "Psychiatric Review Technique", the PC indicated that plaintiff's condition had been measured against the criteria of Listing 12.02 pertaining to organic mental disorders, Listing 12.04 relative to affective disorders, Listing 12.08 pertaining to personality disorders, and Listing 12.09 relative to substance addiction disorders. In those four areas, the PC respectively found that plaintiff suffered from intellectual deficits suggestive of a verbal learning disorder, a dysthymic

disorder, a personality disorder not otherwise specified, and behavioral changes that were evaluated under the criteria of Listings 12.04 and 12.08.  In terms of functional limitations, the PC found that plaintiff suffered from moderate limitations in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace but that there was insufficient evidence of episodes of decompensation, each of extended duration.  In the summary portion of the form, the PC noted that there was a lack of objective evidence to support plaintiff's reported history of significant mental problems and that, although she appeared depressed at the two consultative evaluations, she did not exhibit any severe impairments associated with that condition.

After acknowledging the IQ test results plaintiff had obtained, the PC indicated that, based on the information that was available, plaintiff's level of functioning was sub-average but was not necessarily at the mental retardation level. The PC found that plaintiff had a history of gainful work experience and the fighting that she had been involved in occurred when she was under the influence of drugs or alcohol.  Based on the observations of her behavior at the consultative evaluation, plaintiff was felt to be capable of simple work. (Tr. pp. 193-206).

The second form that was completed by the PC on January 18,

2008 was captioned "Mental Residual Functional Capacity Assessment". There, the PC found that plaintiff was markedly limited in one area of understanding and memory but was not significantly limited in the other two areas; that she was markedly limited in one area of sustained concentration and persistence, was moderately limited in another, and was not significantly limited in the other six; that she was moderately limited in three areas of social interaction but was not significantly limited in the other two; and, that she was moderately limited in three areas of adaptation but was not significantly limited in the fourth one. The PC concluded that although plaintiff could not work with the general public, she had the ability to learn and to perform simple tasks of limited complexity, that she could work a forty-hour week, and that she could relate to supervisors and co-workers on a superficial basis. (Tr. pp. 215-218).

On that same day an Administration disability examiner ("DE") reviewed plaintiff's file and set forth her findings in a "Physical Residual Functional Capacity Assessment" form, identifying plaintiff's disabling conditions as a burn to the left leg and hypertension. In the form, the DE checked off the appropriate boxes to indicate that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or walk for six hours per eight-hour

22

workday; had an otherwise normal ability to push and/or pull; could never climb a ladder/rope/scaffolds but could occasionally perform the other six postural maneuvers; had no manipulative, visual, or communicative limitations; and, was to avoid work requiring concentrated exposure to hazards.  In the concluding portions of the form, the DE found that plaintiff' allegations of being unable to sit, stand, or walk were only partially credible as there was no medically determinable impairment to account for such limitations which were at odds with her activities of daily living and with the results of the examinations that had been performed. The DE also took issue with the findings that had been made by Dr. Jasmin as being inconsistent with the activities that plaintiff had indicated she was capable of. (Tr. pp. 207-214).[3]/

Routine bloodwork was done on March 4, 2008. (Tr. pp. 277-278).  Plaintiff was seen by Dr. Anthony Pham of the BMC on March 31, 2008 to obtain the results of the testing at which time she complained of chills, nausea, and vomiting two days earlier.  The treatment note from that date was positive for a history of polysubstance abuse.  She was referred to Dr. Geoffray and was to

_____

[3]/ On the eighth page of the form, the DE indicated that plaintiff had filed a previous application for Social Security benefits that was initially denied on February 23, 2005 and was apparently not appealed further. (Tr. p. 214).  The pre-hearing brief from plaintiff's non-attorney representative also references a prior application for Social Security benefits. (Tr. p. 136).

return to the clinic in three months. (Tr. pp. 274-275).
Additional bloodwork was done on June 10, 2008. (Tr. p. 270-271).
Plaintiff was next seen by Dr. Pham on June 16, 2008 and she was
having sleeping difficulties at that time. Her blood pressure was
within normal limits. Medications were prescribed and plaintiff
was to return in three to four months. (Tr. pp. 268-269). A
gynecological appointment that was scheduled with Dr. Geoffray for
August 7, 2008 was rescheduled to a later date. (Tr. pp. 272-273).
Plaintiff ultimately saw Dr. Geoffray on August 29, 2008 but a
routine examination was declined. A mammogram was scheduled as was
a follow-up pelvic ultrasound. (Tr. pp. 266-267, 264-265). That
testing went forward on September 19, 2008. The mammogram revealed
a suspicious density in the right breast which was to be evaluated
further via an ultrasound. Ovarian cysts were demonstrated through
pelvic and transvaginal sonograms. (Tr. pp. 258-263). A subsequent
ultrasound of the right breast was negative. (Tr. pp. 250-252).

Plaintiff was next seen by Dr. Pham on October 8, 2008 for a
regular checkup and a medication refill. Screening paperwork was
positive for occasional alcohol use but was negative for the use of
street drugs. Plaintiff was said to be feeling well at the time
and she was continued on her blood pressure medication. (Tr. pp.
248-249). She was next seen by Dr. Geoffray on October 13, 2008 to
obtain the recent test results and for her annual exam. Plaintiff

was then said to be suffering from on-and-off back and abdominal pain at a level of "8" for the previous year.  The diagnosis was perimenopausal bleeding and bilateral ovarian cysts.  Further testing was ordered. (Tr. pp. 246-247).  Plaintiff received an influenza vaccination on October 27, 2008. (Tr. pp. 244-245).  On November 12, 2008, she was seen at BMC for an endometrial biopsy and a urine pregnancy test and was additionally treated for an abscessed tooth and bronchitis at the BMC emergency room. Unfortunately, the biopsy could not be successfully completed. Plaintiff was to return following medical clearance for the scheduling of a dilation and curettage. Medications were also dispensed and plaintiff was instructed to see a dentist as soon as possible. (Tr. pp. 229-242).  Finally, on November 20, 2008, plaintiff was seen by Dr. Grego Lanata of the BMC Podiatry Clinic for a check-up regarding her foot condition.  However, the doctor's treatment note from that date was not a model of legibility. (Tr. pp. 227-228).

As noted earlier, plaintiff challenges the Commissioner's decision to deny SSI benefits on six separate grounds, with the first four of those implicating the correctness of the ALJ's finding that plaintiff's condition did not satisfy the criteria of Section 12.05(C) of the Listing of Impairments.  Related as they are, plaintiff's first four challenges will be addressed together.

Section 12.05(C) of the Listing of Impairments provides that an individual will be considered presumptively disabled if she suffers from:

> *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
>     *    *    *    *    *    *    *    *    *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;...

A reading of the Listing makes clear that it has two independent components: a diagnostic description of the disorder and specific criteria measuring the disorder's severity. See Randall v. Astrue, 570 F.3d 651, 658 (5th Cir. 2009). To satisfy the requirements of Listing 12.05(c), a claimant must demonstrate: 1) a qualifying IQ score, i.e., a valid verbal, performance, or full scale IQ of 60 through 70; 2) an onset of the impairment before age twenty-two; and, 3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006); R.O.L. v. U.S. Comm'r. Soc. Sec. Admin., 2010 WL 996422 at *2 (W.D. La. March 17, 2010).

At the outset of the administrative hearing that was held on January 6, 2009, the ALJ invited plaintiff's non-attorney representative to make an opening statement which he proceeded to do, as follows:

> REP: Okay, okay. Yeah, this is the case of Ms. Laveta Diane Sowell. Date of application, it's SSI only, is September 12, 2007. The alleged onset date was September 1, 1988, but we would amend that today, since it's SSI only, to September 12, 2007. And Ms. Sowell has never really engaged in substantial gainful activity. She's had a couple of jobs that lasted for very short periods of time. She went to approximately the 11th grade in school, and was in special education.
>
> CLMT: Um-hum
>
> REP: And at the age of eight months, she was injured in a severe house fire, and as a result, has three toes amputated on her foot, as well as another one that was on the - - and that's just - - this affects her ability to ambulate. During school, Ms. Sowell really didn't learn too much. The State Agency sent her our for a psychological evaluation. Dr. Culver (Phonetic), he administered the WAIS-III. However, the, the verbal IQ was 65, performance IQ was 80. From reading the report, it appears that those scores were, were valid, because Laveta put in good effort on the test. Dr. Culver did comment that the full-scale IQ was not interpretable, but the other scores looked like they were all right. So, basically, my argument is that Ms. Sowell's condition meets section 12.05(c) of the listing of impairments, the valid verbal IQ of 65, and then, also has a severe impairment from the amputation of her toes which greatly affects her ability to ambulate.
>
> ALJ: All right. What, what would be the problem with sitting?
>
> REP: Well, I think it just establishes that, I think, what we have to establish, that we have another severe impairment, the second part of it, of the 12.05(c)

listing, as long as it's a severe impairment.

ALJ: I think it has to have functional limitations with it, as well.

REP: Right.  But she does have functional limitations where she's - - it does affect her ambulation, which the State Agency consultative examiner described.

ALJ: <u>Imposing additional and significant work-related limitation of function.  So, that is the primary issue here</u>.

REP: Um-hum, right.

ALJ:  <u>Because, I, I would acknowledge the rest of your remarks</u>.

REP: Okay.

ALJ: <u>It's just whether the foot impairment</u> - -

REP: Um-hum.

ALJ: <u>At least, that's what I'm looking at</u> - -

REP: Okay.

ALJ: - - <u>in making this decision</u>. Whether it meets that section - - that would be the easier way to decide the case, if that were true.  But - - 

REP: Okay.

ALJ: - - you know, we can also look at it in terms of functional ability to perform other work, so - -

(Tr. pp. 13-15)(emphasis added).[4]/

---

[4]/ Interestingly, the Commissioner has now conceded that plaintiff has "other impairments that impose additional and significant work-related limitations" of function. (Rec. doc. 22-1, p. 5).

Based upon a review of the above-quoted exchange, it appears that the ALJ initially had no question about the validity of the IQ test scores plaintiff had obtained and was only concerned with the third element of Listing 12.05(C), the existence of a physical or other mental impairment imposing an additional and significant work-related limitation of function.  Contrary to that apparent position, the ALJ subsequently issued her written decision in which she found the verbal IQ score of 65 to be invalid based on the fact that mental retardation had not been diagnosed by Dr. Culver as well as the fact that plaintiff obtained a performance IQ score of 80 on the same test. (Tr. p. 52).

To satisfy the criteria of Listing 12.05(C), however, a formal diagnosis of mental retardation is not required.  <u>Maresh</u>, 438 F.3d at 899.  While the lack of such a diagnosis under Axis II can be probative of an IQ score's invalidity, additional factors are typically present such as a claimant's minimal cooperation and interest and an attitude suggestive of malingering, <u>Felver v. Barnhart</u>, 243 F.Supp.2d 895, 904 (N.D. Ind. 2003), or the IQ scores were inconsistent with the claimant's proven functionality at school and at work.  <u>Medina v. Astrue</u>, 2009 WL 6498265 at *4-5 (W.D. Tex. June 2, 2009), <u>adopted</u>, 2010 WL 2079948 (W.D. Tex. May 21, 2010)(plaintiff previously worked as an automobile painter from 1986 to 1995, writing and completing reports and using technical

knowledge and skills).  By contrast, when plaintiff was tested by Dr. Culver there was no evidence that she was missing items on purpose and as the difficulty level of test questions increased, so did the number of her errors. (Tr. p. 158).  Although Dr. Culver noted that the results of the verbal and performance testing were "significantly different" and that the full scale IQ score was not interpretable, the interpretable scores that were obtained were felt to be accurate with a confidence level of 90%. (Id.). Whatever discrepancy there may have been between the verbal and performance IQ scores, the Regulations provide that ".... where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQ's are provided in the Weschler series, we use the lowest of these in conjunction with 12.05." Section 12.00(D)(6)(c), 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In finding the IQ score of 65 to be invalid, the ALJ also criticized Dr. Culver's failure to discuss what effect the existence of other diagnosed impairments and plaintiff's history of polysubstance abuse may have had on her testing performance.  At the time of the evaluation, plaintiff reported using marijuana six months earlier, crack cocaine eighteen months earlier, and alcohol one week earlier.  The existence of the other conditions that were diagnosed by Dr. Culver as well as plaintiff's substance abuse were

obviously known by the doctor and did not cause him to detract from his 90% testing confidence level. Among the findings that Dr. Culver did make was that plaintiff had a GAF of 45, a score that is indicative of a serious impairment in social, occupational, or school functioning, including the inability to hold a job. <u>Case v. Astrue</u>, 2009 WL 916374 at *3 (E.D. La. March 24, 2009); <u>Nickerson v. Astrue</u>, 2009 WL 321298 at *5 n.1 (N.D. Tex. Feb. 6, 2009).

The ALJ found that listing-level severity under Section 12.05(C) had not been established because the qualifying IQ score was deemed to be invalid.  She went on to observe that the record contained no clinical correlation or reports of significant deficits in adaptive functioning.  Adaptive functions include "... cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Section 12.00(C)(1), 20 C.F.R. Pt. 404, Subpt. P, App. 1.  <u>See</u> <u>Arce v. Barnhart</u>, 185 Fed Appx. 437, 438-39 (5th Cir. 2006); <u>Blancas v. Astrue</u>, 690 F.Supp.2d 464, 476 (W.D. Tex. 2010). On that front, the Court simply notes that plaintiff dropped out of high school where she was taking special education classes.  At age forty-five she still lived with her mother and has never maintained a separate residence. The ALJ admitted that plaintiff essentially had no past relevant work with her work history including only

31

brief stints at unskilled jobs ranging from two to seven months. (Tr. pp. 31-32, 111).  Despite it being administered to her orally, plaintiff was also unable to pass the driver's license test and thus did not drive.[5]/  Nor was she able to use public transportation. (Tr. p. 122).  The extent of the household chores that she was credited with by Dr. Culver were simply folding clothes or sweeping and, although she indicated that she was capable of going to the grocery store, that was qualified in the Function Report to require being accompanied by her mother. Plaintiff additionally testified that on the occasions that she had gone alone, she had picked out the wrong item.  Plaintiff had no bank account, could not pay bills, and could not use a checkbook/money orders.  Her reading ability was limited to words that were several letters in length. Dr. Culver also observed that she had no friends.  In short, contrary to the ALJ's observations, the record does contain significant evidence of adaptive deficits.

Finally, in her third challenge to the Commissioner's decision plaintiff argues that the ALJ improperly discounted the validity of

_____

[5]/ In her written decision, the ALJ twice remarked that plaintiff had admitted to Dr. Culver that she had been arrested for DWI, thus suggesting that she had at least driven in the past even if she did not possess a valid driver's license. (Tr. pp. 55, 58). A review of Dr. Culver's report, however, reveals that plaintiff was brought to the evaluation by her father and that "DWI's were denied." (Tr. pp. 155-156).

her IQ test score based on her history of drug abuse and chronic
dysthymia rather than evaluating those conditions for medical
equivalence under 20 C.F.R. §416.926(b)(3). In her written
decision, the ALJ stated at several points that plaintiff did not
have an impairment or combination of impairments that met or
medically equaled any of those set forth in the Listing of
Impairments. (Tr. p. 49). On that point, Social Security Ruling
96-6p requires that an ALJ must receive expert opinion evidence on
the issue of medical equivalence before rendering a ruling at Step
3 of the §416.920 analysis. SSR 96-6p, 1996 WL 374180 at *3 (July
2, 1996). Certain Administration forms, such as the Psychiatric
Review Technique form that was signed by the PC on January 18,
2008, satisfy the expert opinion obligation imposed by SSR 96-6p.
A review of the latter form, however, reveals that plaintiff's
condition was measured against the criteria of Listings 12.02,
12.04, 12.08, and 12.09 with the section of the form pertaining to
Listing 12.05 simply being left blank. Any medical equivalence
analysis that was done by the ALJ in the present case thus lacks
adequate support. See Brown v. Astrue, 2010 WL 4537019 at *7 (S.D.
Miss. Oct. 8, 2010), adopted, 2010 WL 4536780 (S.D. Miss. Nov. 2,
2010).

The Court is aware that an ALJ may properly make factual
determinations on the validity of the IQ test scores that Listing

12.05(C) requires. In <u>Muse v. Sullivan</u>, 925 F.2d 785, 789-90 (5th Cir. 1991), for example, the ALJ correctly discounted the claimant's full scale IQ score of 58 based on the fact that he had not worn eyeglasses during the doctor's evaluation and therefore had trouble seeing. Also noteworthy was the fact that the claimant had passed a written examination to obtain a chauffeur's license and had thereafter worked as a truck driver reading delivery tickets and making deliveries to destinations specified on the tickets. <u>Id</u>. Based upon a review of the record as a whole, the plaintiff in the present case does not have that level of functionality possessed by the claimant in <u>Muse</u>.

In short, substantial evidence does not support the ALJ's determination regarding the validity of plaintiff's IQ scores. Because a person's IQ is generally presumed to remain stable over time, <u>Maresh</u>, 438 F.3d at 900, it can reasonably be inferred that plaintiff's mental deficits had their onset before age twenty-two. And, additionally, plaintiff was a special education student while in school which corroborates learning difficulties. The Commissioner has now conceded that plaintiff has other impairments that impose additional and significant work-related limitations of function. <u>See</u> note 4, <u>supra</u>. Plaintiff has thus satisfied the criteria of Listing 12.05(C). Accordingly, it will be recommended that plaintiff's case be remanded to the Commissioner for an award

34

of benefits.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be granted, that defendant's motion for summary judgment be denied, and that plaintiff's case be remanded to the Commissioner for an award of benefits.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this  22nd  day of  ___August___ , 2011.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE